Good morning. May it please the court, my name is Todd Larris. I represent appellant Vera Kuzmenko. I'm also here with co-counsel Mr. Eduardo Roy, who represents Rachel Siders. Both of us were trial attorneys in this case. As the court knows from its review of the record, Vera Kuzmenko and Rachel Siders' case occurred at a time that was later than the other group that was just referred to in oral argument, the previous case. We went to trial about 10 months later. In terms of the proffer of the Lindsay information, Ms. Kuzmenko, Vera Kuzmenko, in my case, offered to Judge Mendez for his consideration an expert report by Sean Martin, Professor Sean Martin from the University of San Diego, who had prepared a report regarding the industry standards generally at the time that predated the mortgage meltdown. And in his report, Professor Martin outlined what he believed was a lack of concern generally throughout this industry regarding the information as to the particular borrowers, but instead the importance of the fact that there was a generally rising standard of property values and it was a security itself. It was the underlying property that was more significant. Despite that proffer, the district court excluded that particular information from being considered by the jury, and as a result, Vera Kuzmenko was not allowed to present evidence to show that the misrepresentations that were alleged to have been submitted to First Franklin Financial were irrelevant. Well, what the proffer is to what he was going to say says this, and the proffer is of his testimony, there's specific evidence regarding how securitization of mortgages created an incentive for First Franklin Financial to engage in fraudulent conduct. And the testimony is the support of the lender criminal liability as a defense. That's different from what you're talking about today. Well, at the time, of course, we were pre-Lindsey as well. Yes. I mean, I understand why, but... And we obviously tried to direct our arguments and focus to First Franklin Financial at the time, but his report went beyond just referring alone to First Franklin of America and Merrill Lynch, and talks about the standards generally for these so-called, as he terms them, liar loans that were occurring throughout the industry at the time. He generally gave an overview of how the lenders would divide these loans into tranches for resale on a secondary market and really weren't interested in whether the borrowers themselves were qualified. At the point is that when that particular information was excluded from consideration by the jury, what it did was essentially cleansed Vivian Hansen, the expert witness, and First Franklin from consideration by the jury about whether or not there was any participation on their part in this environment of encouraging statements in loan applications that really didn't matter, but mattered to them. Right. But I guess it may get down to the standard of review. That argument was not presented to the judge, right? The argument... That you just made. As to admission of the expert testimony. And I grant you that that those statements were in the report, but basically, the defense said, I want to put on an expert as to incentives to create for First Franklin to engage in fraudulent conduct, which is not permitted under Lindsay. And two, lender criminal liability as a defense. And the second point would be far more general than the first, and that would be the general environment. None of those talk about materiality. It may not have been articulated in precisely the way that Lindsay later would have made it clear, but nevertheless, by the time the second round case came with Ms. Siders and Vera Kuzmenko, at that point, this information had been revealed to Judge Mendez in terms of being provided for sentencing purposes for the first group of defendants, and then was being proffered by Vera Kuzmenko to attack generally what was happening in the mortgage industry, as well as specifically with First Franklin. And I recognize that under Lindsay, which came afterwards, that the portion about what was going on specifically with First Franklin would not have been admissible. But having listened to the previous argument, what it ended up doing is it put First Franklin in a position where the jury was never allowed to consider information that what was important to First Franklin was property values continuing to rise as part of this general throughout the industry standard. We weren't even allowed to go there. We were completely precluded from presenting that information, and as a result, when cross-examining Ms. Hanson and, in addition, the other two sets of witnesses that the government presented in this case, which would have been either cooperating witnesses in the scheme or so-called straw buyers, there was never any development about what the source of the particular information would have been. We weren't allowed to present information that they disclosed would have been material throughout the lending industry as a whole at that time. So — But suppose the indictment had charged First Franklin and your clients together in a criminal conspiracy and also had charged the wire fraud. There is something disquieting about the notion that if you make a false statement to a person who is also acting fraudulently and they don't care about it because they have their own motives for fraud, it's then not material. I mean, as I said before, clearly the answer was material, right? If they hadn't said that they had these attributes, they wouldn't have gotten the loan, and the fact that the person who you're making it to is essentially in cahoots with you to not care about the truth of it, does that make it nonmaterial? Well, there are two aspects to that. First of all — Let's assume everybody's doing it. And if we assume that generally across the industry that everyone was doing it — Right. Obviously, there would have been some reason why First Franklin or any other lender in that position at that time would have wanted those statements. Which is different from we don't care what the answer to this question is. They did care what the answer to the question was. They just may not have cared whether it was true. But that — but they did care what the answer was. They cared to have the answer in the paperwork in order to go to the next step on the resale market. Exactly. But that would be a different consideration than whether or not it was material to the — But that's my question. Why is the question whether it influenced them as opposed to was material in some larger sense to the mortgage market? Well, as was said in the previous argument, I was listening back there — That's why we cluster cases. But sometimes it's disquieting when you're sitting and you want to jump up and say, I've got something to add. The fact of the matter is that these statements were in the loan applications. But the important and significant consideration for the industry generally was this expectation that property values were going to continue to rise. The statements themselves, these so-called liar loans, there was this general perception — it can be argued based on the expert — that they didn't matter, and that the lenders were not relying on that. But the reason the market collapsed was precisely because the people couldn't pay their loans and there was enormous foreclosures. Well, and as Dr. — So it was material to the entire system. It just may not have been material to the particular — to the even — to all of the lenders, let's say. And as Professor Martin had indicated in his report, I think one of the things — if his testimony had been allowed to be presented to the jury, he would have been able to offer that it wasn't so much the lack of reliability of the borrowers, but the lenders' expectation that market values were going to continue to be where they were, that they were protected because as long as you have a rising tide that lifts all boats, you never had to worry about deficiency judgments and going after the borrowers, because the property would have been enough to secure it. And we weren't even allowed to present that argument as an alternative to say, look, there was really no intent to defraud here. These were investors who were going out and giving the industry generally what it was asking for at the time. Your time is running out, but I wanted to ask you, would you address the government's harmless argument? Well — And you raised the issue of the loss calculation. Regarding the harmless argument, the government is arguing essentially that because Ms. Kuzminko and Ms. Siders were involved in so many of these transactions, that the evidence itself would be overwhelming so that the exclusion of the defense would not have amounted to much. But the fact of the matter is that what happened here is not harmless because it allowed the cleansing I referred to earlier of both the first Franklin witness who was presented and all of the co-participants and the straw buyers to make them look as if they came in with clean hands and had been victimized by someone when in fact they were participating in this same general overall environment in the lending industry at the time that anything goes and, you know, as the Lindsay case refers to it, it's the Wild West. And the loss calculation, you raised that? Actually, that was Mr. Royce. Yes. I'll defer to him at this point. So before, okay. Very good. Yeah, we'll... Twenty-three. Good morning, Your Honors. My name is Eduardo Roy. May it please the Court. I was Ms. Siders' trial counsel at the lower level. And I'd like to focus on whether the district court properly calculated the offense level for sentencing when the record was absent of evidence to support the 20-level increase that was given to Ms. Siders. There was absolutely nothing in the record that allowed for this increase. And under the Howard case, the burden was on the government in order to show the facts on why there was a 20-level increase. The Howard case says that the burden places... seeking to adjust the offense level. Here, the offense level is approximately... was increased over 20 points. The government was seeking a special favor at the sentencing. And therefore, the government bared the burden at that point to show why. In other banking cases that I've done at sentencing, the banks have come forward and they've shown that there were interest that they were applying, that there were fines that they were applying, that when there were late payments, they were applying those costs. And, you know, in one case in particular, those fines and interest payments, you know, were several hundred thousand dollars. So now when you multiply this by the number of counts that were against Ms. Siders, it's just untenable that we had nothing in the record to be able to contest. You're not objecting to the basic method of calculation, i.e. taking loans and subtracting... I mean, taking the principal and subtracting the recovery and whatever else should be subtracted. You're just saying the numbers aren't there. We're saying that the numbers are not there. You're not complaining about the system that was used, about the methodology. Yes, I'm complaining about the methodology also because in order to have a proper methodology, you have to have the proper calculation, all right? And the calculation here would have been... But in some of the other cases, the complaint is that because of the securitization, the bank, in fact, did not lose money when there was foreclosure and because they had already recovered all their money. So if the bank's the victim, you shouldn't be counting this at all. But that's not what you're saying. In this case in particular, what I'm saying is that we were given no facts to attack the numbers. Did you object on that basis? Did you say there's no documentation as to these numbers? Absolutely. Where? In our sentencing report to the court. And what was the response by the probation officer? The probation officer actually gave a higher the PSR came out at 212. Judge Mendez sentenced her at 151. It was an increase of 20 levels, however. Now, if you objected to the amounts, how did the probation officer respond? In broad strokes. They didn't respond at all? No, it was a very broad stroke response, Your Honor. Where did the probation officer get the number? It was about 16 million. From the government. And you didn't say there was no basis for the 16 million? We said there was no basis for the 16 million, and we needed a formula or some type of calculation to protest it. The government's response is we should have asked for an evidentiary hearing. Well, the burden is not on us. Once we objected in our papers — Well, they said the amounts were before the court. I couldn't quite figure out where it was, but they kept saying it's in the record. It was not in the record. It was not before the court, not as we have argued it. Well, what about Government Exhibit 1, which I think is on ER 1139? There are detailed transactions listed. Why wasn't that sufficient? Because it doesn't give the breakdown, for instance, in the last banking case I had where the breakdown was, okay, they were putting in X amount of money for fines. They were putting in X amount of money for attorney's fees. They were putting in X amount of money for late payments. And all those cannot be calculated into the calculation. I mean, the courts have said that's improper. And so when we're giving nothing — in fact, here, there was no victim impact report that was submitted. In the last case I was in, the bank submitted a very detailed victim impact label because they were trying to get all the money of their loss. And in that statement, they included a lot of costs that they weren't entitled to. And so we were able to attack those costs. I thought all the bank did — I thought all the government did here was to say this was the amount of the loan, this is what was recovered in foreclosure, and the difference is the loss. That was it. Well, that's what they did, right? Yes. Correct. What's wrong with that? Because we don't know — you have to go below those numbers, Your Honor. I mean, when — Well, I understand that. But the basic methodology seems to be sanctioned by our case law. I don't think it is, because in the case law it says that there are certain costs that are not attributable in the county costs. No, but all they represented was the amount of the loan, what they recovered in foreclosure, and the difference was the loss. And they just went through each loan, totaled up to $16 million. In the amount of each loan, there are costs that make up that total amount. And those were the numbers that we were trying to get at. Those were the numbers that we were trying to obtain. Right. But you didn't have them, right? Correct. So, we don't know what your theory is about what the amount of loss is. True. Right. So, if we — But, I mean, that's a discovery issue, not necessarily an error on the district court in what was presented. No, because once we filed our papers, the government then had the burden of proving how they are getting to this increase. In fact, that's what the Howard case says, right? The burden then is on them. And so, we're asking for a resentencing so that we can go back and argue that issue and determine how much the loss should have been. OK. Thank you. Thank you. You're a little bit over your time, though. Good morning, Your Honors. Lee Bickley on behalf of the United States. May it please the Court. I was trial counsel in this case. Let me start with loss, because that's where we ended up in terms of defendants' arguments. At the time of sentencing, the defendants were not objecting to the calculation of the loss. Nobody said this loss should be $15 million versus $16 million. In fact, in their briefs and in their argument, the defendants argued our position on that is that the loss amount calculation is erroneous by its very nature, because it takes the high inflated value of the property and uses the low value of the property upon resale at foreclosure and takes no account whatsoever into the fact that First Franklin was reselling these loans on a secondary market for a profit. They were arguing the loss amount calculation is erroneous by its very nature, because the discovery materials and testimony provided by the government do not support the claim loss and so on. So they did contest the actual numbers. Well, they did. Not in detail, but in general, that we don't have enough information. Well, they said they do, but they also admitted that they knew what the basis for the numbers were, that it was principal amount versus resale value. Well, they knew that that was how it was said to be calculated, but my understanding is that their complaint is that, and I don't know whether this is so or not, that there was no setting out loan by loan of where these numbers came from. That is just not true. At the time, they were not focused on the calculation itself, and it was in the record. But where in the record is it? Because you kept saying in the briefs, it's in the record, it's in the record. But you don't point to where it's in the record. Oh, Your Honor, it's at PSR, Cusmanco PSR, paragraph 31, Ciders PSR, number 39. PSR, Cusmanco's? Cusmanco PSR, paragraph 31, Your Honor. Okay. Hold on. They break out the loss amounts by lenders. And then Ciders PSR, paragraph 39, Your Honor. They break out the loss amounts. The probation officer breaks out the loss amounts per lender victim. And then if you ---- But that's by lender, and it's not by loan. Yes. But you can find the calculation because all the loan principal amounts are found at SCR 1133 to 34. So if you take all the principal amounts by lender and minus it, you find the calculation. In addition ---- What do you mean, minus it? Minus by the foreclosure prices. And where are the foreclosure prices? That specifically was not in the record in terms of the case. However, at the time of trial ---- So you can't go to the record and do calculations and figure out whether the numbers are right. You can do those calculations. How? Because you can take the principal amounts of the loans, and then you know what the resulting amount is, $15 million, and you can see the foreclosure prices in there. I mean, but that by reverse engineering. By reverse engineering, Your Honor. And I will also tell you that before the Court at the time, we had a binder for every specific loan, which the defendants had in discovery and which the Court had for its review. Which included the foreclosure prices. Which included the foreclosure prices. It had a whole chart with respect to principal amount minus foreclosure price and the final amount. That final amount was what was put in the PSRs. And it had supporting documents. So if you added those all up, they would add up. They would all add up. Oh, isn't that marked as an exhibit? Your Honor, in retrospect, we probably should have in the sentencing argument. But it wasn't a challenge. Maybe in your brief. I mean, all you said in your brief here was in complete generalities. Well, we talked about the reverse engineering that you could do, Your Honor. But with respect to whether it was included, we should have included it. Or at least a summary, you know, a spreadsheet. Right. You are correct, Your Honor. In retrospect, I would have included that two-page summary. However, there was enough in this record for the loss amount to be determined. And I gather your argument is if they'd raised the specific objection they're raising here, you would have put it in. Oh, you're completely right. I mean, it's a two-page summary. I mean, it was in discovery. It was a binder provided to the Court. The Court had looked at it previously. So you were 100 percent right, Your Honor. Going back to the test the issue of the expert testimony, here's a case where the trial court got it right. It excluded an expert that was to testify regarding the reliance, negligence, and intentional disregard of one specific lender in this case, First Franklin and not general lending standards in the mortgage industry. This is a case where the defendants did proffer for the record what they were intending to do, and they specifically said at the time of trial that they wanted to introduce testimony to support an inference that First Franklin Financial knew of and approved of borrower misrepresentations in loan applications. They proffered that the expert would provide specific evidence regarding how securitization of mortgages created an incentive for First Franklin Financial to engage in fraudulent conduct. They were not talking about, at the time of trial, national lending practices or the entire mortgage fraud industry. Ginsburg. But the report did. The report did, did it not? Well, the report is pretty specific with respect to three lenders, First Franklin, Merrill Lynch, and Bank of America. It doesn't discuss general lending practices in the industry. I thought it did. If you go through paragraph after paragraph, paragraph 35, this is on ER-64s. First Franklin, Merrill Lynch, you can go through. And other banks. And other banks, Your Honor. And institutions. Right. But it is very much focused on First Franklin, Merrill Lynch, and Bank of America. So the report is specific with respect to the lenders in this case. And in part, and in part not. So it would have been at least in part admissible. And so the question is, do we look at the report? Do we look at what they said their reasoning was? Well, I think you need to look at what they said that their reasoning is. I mean, we can see the district court shouldn't have to speculate with respect to what could be introduced in testimony. Here we specifically had the defendants proffer what they were going to use that report for, and it was very specific to First Franklin. And that's what the Court ruled on. The — Did — did this — did Ms. Hanson testify here as well? Yes, she did, Your Honor. To the exact — essentially the same way? I can't tell you if it was essentially the same way. I can tell you that it was — I mean, what was significant to you and so on. Well, it was very — it was with respect to the loan applications. Right. So, for example, was whether a borrower represented on the loan application that she would live in a property, something that could have been significant to First Franklin. So — I — I would like another explanation of why that isn't inconsistent with Lindsay itself. Well, it's not inconsistent with Lindsay because here we're talking about what's And the idea is what, Judge Bresan, you were trying to get at earlier, that these representations actually did matter, that on a loan application — Well, at least in the other trial. I have not read the transcript in this one. She said at points that they would investigate and that what mattered was the truth of it, not just what was on the piece of paper. In this case, we were specific to what was on the loan application in our questioning. And in addition, I mean, Ms. Hansen was called for various different reasons. In this case, she was called as a custodian of record to talk about what the loan applications were, what the supporting documents were. She testified generally to potential significance of certain misrepresentations on a loan application. She wasn't testifying to reliance. Well, that's what I mean, potential misrepresentations on a loan application. And she was talking to — So she's testifying. Is she not testifying as to whether Franklin — First Franklin would care whether the representations on a loan application were true or not? She was testifying to what could be significant. And, for example, she's testifying to — To First Franklin. To First Franklin. Okay. Yes, Your Honor. So that is specific evidence with regard to a particular lender. And it seems to me what Lindsay says isn't supposed to happen. Now, I don't know why it shouldn't happen. It makes sense that it happens. But Lindsay says it's not supposed to happen. Well, in Lindsay's case, and I will also draw the Court's attention to the Betz-Gaston case, which was a more recent Seventh Circuit case, in both of those cases, lender representatives were called. Well, fine. But I don't understand how the standard only runs in one direction. Well, Your Honor, it doesn't run in only one direction, because, for example, the defendants were able to cross-examine Ms. Hansen on all of the statements that she was making. But you're saying — insisting that they weren't allowed to put on any evidence about First Franklin. But the evidence that they were proposing to put on about First Franklin would not have been contrary to Ms. Hansen's testimony. Well, she says that they cared about the truth of these, and they said they didn't — that they were going to put on evidence that they did. They were going to, pursuant to their disclosure, put on evidence with respect to the incentives for First Franklin to intentionally disregard information. They weren't, for example, going to challenge that First Franklin actually did have a policy in place that offered 100 percent financing to primary resident for investment properties. They weren't going to put on testimony that First Franklin verified income with bank statements, 1099s and W-2s. They weren't actually going to be challenging her testimony. That expert was a different subject area, Your Honor. And going back to what the Court in this case did, the Court in this case granted the government's motion to exclude Professor Martin's testimony as it found the testimony concerned a lender and reliant in lender negligence for one lender. It specifically referred to the Leidos case. And if you look at the Leidos case, there's a case where the Court held that evidence that Bank of America, one of the lenders in this case, and other banks to whom false statements were made in that case did not rely on the false statements, gave no weight to the defendant's false statements, or were negligent to the point of complicity, was not exculpatory. So the Court was ruling on what the defense had proffered, and that was specific to First Franklin. And under the Lindsay decision and also under the Betz-Gaston decision in the Seventh Circuit, that was appropriate here. With respect to the Martin report, as we said, the Court should not have been required to speculate on what it was going to be used with or used for. Then, in addition, the defendants, with respect to Ms. Hansen, they were able to cross-examine her at length. They asked about what representations were important to First Franklin. They asked what information First Franklin checked and relied upon. They asked about what representations the mortgage brokers checked. They asked whether these were full-document loans. And that's another important aspect to this case. These are not the stated income loans that the defendants seem to be crying about. These are full-document loans. The defendants in this case spent thousands of dollars to fake bank statements. The defendants in this case spent money to fake tax returns, to fake W-2s. These loans were fully supported with lots of supporting material, and the defendants went to great efforts in order to make them supported in that way. And, you know, if this Court should find that this case is — was error to exclude Mr. Martin's testimony, the United States position is that it would be harmless error. And you don't just need to look at the evidence in terms of materiality. Here you need to also look at what the nature of the testimony is. Not — Professor Martin, regardless of any sort of proffer or what is in his report, no one was going to say that a certain income did not have to be reflected on these loans. No one was going to testify that the primary residency did not have to be checked. And, Judge Berzon, this goes to your point in one of the earlier arguments. Here the determination is you need to make a false statement and it needs to be capable of influencing a person to part with money. Here, no expert was ever going to testify that it was not capable of influencing any of these lenders to part with money, and that's materiality. So regardless of what this expert was going to testify to, it wouldn't have disproven materiality. Then, in addition, with respect to harmless error, the evidence in this case was overwhelming on materiality. Here we have the defendants enriching themselves by millions and millions of dollars by faking bank statements, faking tax returns. They believed that these statements were objectively material. They even admitted that these statements were objectively material. For example, Vera Kuzmenko herself was giving money to some of the straw buyers to put in their bank accounts. She told them that the banks wouldn't approve the loans without the loans. Sotomayor, what does that pertain to? Pardon? I understand that, but does that prove materiality? It helps to prove materiality, yes, because Vera Kuzmenko is a licensed real estate agent. She is working at that time, and she is funding bank accounts because she believes that those are the banks would not approve the loans. That's her experience. That is very strong evidence of materiality. The same thing with respect to the other admissions that some of these defendants made, and there was testimony. For example, Ms. Siders instructed two of her employees to withhold information and to certain disbursements and payments out of escrow. She told, for example, her co-defendant, Leah Isom, that the reason for this is that the loans would not get funded unless these false statements were made to the lenders. Ms. Siders is admitting materiality. Ms. Kuzmenko is admitting materiality. Isom, a co-defendant in this case, she testified that the banks would not have funded the loans in this case if certain statements weren't made. Nadia Kuzmenko, one of the co-defendants that you're going to hear about in a few minutes, she told Isom that certain payments should not be disclosed. Vera and Nadia Kuzmenko went to great efforts and spent a lot of money to think bank statements in this case. Why would they spend thousands of dollars if these statements were not material? They created invoices, work orders, loan disbursements, requests for verification of rent or mortgage. They created fake business licenses, tax preparer letters, tax returns, letters of explanation, again and again through their actions and through their statements, these defendants have admitted that these statements were material. Then in addition, if you look at what the lenders were saying, and this isn't specifically mentioned in the brief, however, it is mentioned in the documents in our SER, the defendants were specifically told by all the lenders that, for example, the primary residence representation was material. In notarized deed after deed of trust after deed of trust, lender after lender informed the defendants in Covenant No. 8 that material representations include but are not limited to representations concerning the borrower's occupancy of the property as the borrower's principal residence. These defendants were told that that occupancy declaration was material. And so it is somewhat troubling that they come in here now and say, oh, no, there was not evidence of that. In addition, with respect to harmless error, these were full document loans, as I said. Document after document after document was created and required by these lenders. Underwriters would review the loan packages to determine if a borrower was qualified for the loan. The bank employees here did bank statement analysis. You can look to the documents themselves, for example, at ER 1651 and 1665. They take these fake bank statements and they do analysis of them. In this case, regardless of what any lender was going to testify to, beyond a reasonable doubt the jury was going to find materiality in this case. When you look at the evidence and also what you look at, any iteration of this expert's testimony was going to be. Now, do Your Honors have any questions with respect to spillover effect? I know it wasn't specifically mentioned with respect to the defendant's arguments here. And I think it was adequately presented in the briefs. So in conclusion, we — this is an easy case, given Lindsey and the Betz-Pickastan case. The lender — the defendants here were going to present evidence specifically with respect to First Franklin. That's what the Court excluded with its testimony. They should not — the Court should not have been forced to speculate as to what the testimony of any expert was. We ask that the Court affirm the sentences and convictions of the defendants. Thank you, counsel. Thank you. We'll hear rebuttal. Put 423 on the clock. Your Honors, we're simply going to split our time on the rebuttal. And I'm just going to address one or two things that were said by the government counsel. And one is, she was reflecting to documents that just are simply not in the record. And because they're not in the record, they — those statements should not be taken into account. But what I will respond is that — Did you have them? Yeah. What I'll say as we respond is, it did not have the breakdown that I was arguing for. And the breakdown that I was arguing for was exactly, did those numbers include attorney's fees? Did those numbers include late fees? Did those numbers include any fees that are not appropriate under the calculation? And that is really what we were asking for. And once we made that argument — And what specific way did you ask for it? I mean, looking at your sentencing memorandum, it was rather a general statement, as far as I can tell. It was a general statement, Your Honor. But where did you ask — I mean, I wouldn't have known from what I just read, if I were the district judge, that that's what you were asking for. In other words, that you wouldn't have been satisfied with, I gather, what you determined. That is, what was the loan and what was the foreclosure sale. And that they — you're not contesting that at least those numbers add up, are you? I'm contesting that I don't know how to properly add those numbers up, because I don't know what the equation was for those whole numbers. Well, suppose it was just the foreclosure sales subtracted from the amount that the House sold for. As far as I was understanding the description, it was the amount of the loan minus what the House sold for, period. Did you figure that much out? We could figure that much out. All right. Where did you ask for something more specific than that? When — in our sentencing memorandum, when we asked especially what a specific breakdown was, Your Honor, at that point, the burden was on the government to come up with — But that was their breakdown. I mean, in other words, it was pretty apparent from that breakdown that there wasn't anything else. They weren't taking out taxes or attorneys' fees or anything else. They were taking out the amount of the foreclosure sale from the amount of the loan. And if you wanted something more specific, didn't you have to ask for it? Your Honor, in all due respect, I don't think it was — first of all, it wasn't apparent. And number two, once we made our objections, that was sufficient for the burden to be placed on the government. And I'd like to reserve the remaining time for my co-counsel. Okay. And I'll address the issue regarding materiality, particularly the government's argument essentially seemed to amount to, well, there was this overwhelming evidence in these documents. And as I indicated initially, what had happened through the exclusion of Professor Martin's documents is what I referred to earlier as this cleansing of the two — the three groups of witnesses, the cleansing of the First Franklin witness and the cleansing of the straw buyers and the cooperators in terms of what their role was in the production of the evidence that the government characterized as overwhelming. They relied primarily on circumstantial evidence regarding Ms. Siders and Ms. Kuzmenko. And there were obviously inferences that we would have asked the fact finder to draw that were different if we had been able to elaborate and learn from Professor Martin about what was the standard in industry generally, not just with First Franklin. Well, that's rather vague. Can you give me an example? Pardon me? I said that's all rather vague. Can you give me an example? I'll try to be perfectly specific about that. There were documents that were faxed back and forth from Voyager Trucking, which relates to a company run by Edward Shevstov, one of the other defendants. The government repeatedly attributed those to Vera Kuzmenko because they came from a fax machine at VK Tax Services. But the fact of the matter is those witnesses were cross-examined and shown to have more connection to Mr. Shevstov than to Ms. Kuzmenko. The government attributes all of that information to Vera Kuzmenko when the fact of the matter is... But what does that have anything to do with the expert testimony? Well, the expert testimony would have shown that generally there was this But among the common populace as well, that these things didn't matter to the lenders and would have been used as an alternative explanation for why the source of this information was not Vera Kuzmenko or Rachel Siders, but these other participants who came and appeared to be clean because of the way the government was able to circumscribe our cross-examination. I see my time is up. Thank you, counsel. Thank you. The case just argued will be submitted for decision. And we will proceed to the last case on this morning's oral argument calendar, which is United States v. Nadia Kuzmenko.
judges: Thomas, Paez, Berzon